FILED

MAR 3 1 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

MARTHA MAYNOR, LESTER LOCKLEAR, )
ALFORD MAYNOR, VONDOLA LOCKLEAR, )
ROY MAYNOR, SKAROREH KATENUAKA )
NATION, a/ka TUSCARORA NATION OF )
INDIANS OF NORTH CAROLINA, )
                                                     )
                  Plaintiffs, )   CASE NUMBER   1:06CV00612
                                                     )
                  v. )   JUDGE: Richard W. Roberts
                                                     )
                                                     )   DECK TYPE: Civil Rights (non-employme
SECRETARY OF THE UNITED STATES )
DEPARTMENT OF THE INTERIOR, )   DATE STAMP: ▉/▉/2006
                                                     )
                                                     )
                  Defendant. )
                                                     )

## COMPLAINT

Plaintiffs Martha Maynor, Lester Locklear, Alford Maynor, Vondola Locklear, Roy Maynor and the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina, complaining of Defendant Secretary of the United States Department of the Interior, allege as follows:

### I. NATURE OF THE ACTION

1. This is an action for a declaratory judgment, mandamus, and an injunction, requiring the Secretary of the Interior to recognize the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina, pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461, *et seq.*, for an order to show cause why Defendant Secretary of the Interior should not be held in contempt for violation of the April 10, 1975 Order of this Court in *Maynor v. Morton,*

1

United States District Court for the District of Columbia, Civil Action No. 337-73, pursuant to *Maynor v. Morton*, 510 F.2d 1254, 1255, 1259 (D.C. Cir. 1975), and for damages for the denial of rights, denial of benefits, and violation of the April 10, 1975 Order.

## II. PARTIES

2. Plaintiff Martha Maynor is a Tuscarora Indian, an Indian as described in the Indian Reorganization Act, 25 U.S.C. § 479, is the full sister of Lawrence Maynor, and is a member of the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

3. Plaintiff Lester Locklear is a Tuscarora Indian, an Indian as described in the Indian Reorganization Act, 25 U.S.C. § 479, is the full sister of Lawrence Maynor, and is a member of the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

4. Plaintiff Alford Maynor is a Tuscarora Indian, an Indian as described in the Indian Reorganization Act, 25 U.S.C. § 479, is the son of Lawrence Maynor, and is a member of the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

5. Plaintiff Vondola Locklear is a Tuscarora Indian, an Indian as described in the Indian Reorganization Act, 25 U.S.C. § 479, is the daughter of Lawrence Maynor, and is a member of the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

6. Plaintiff Roy Maynor is a Tuscarora Indian, an Indian as described in the Indian Reorganization Act, 25 U.S.C. § 479, is the son of Lawrence Maynor, and is a member of the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

7. Plaintiff Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina, is a sovereign nation. Plaintiff Skaroreh Katenuaka Nation is organized around its constitution, which is the Iroquois Great Law of Peace.

8. Defendant Secretary of the United States Department of the Interior is the Secretary or the Acting Secretary of the United States Department of the Interior, and is sued in his or her official capacity.

### III. JURISDICTION

9. This civil action arises under the Constitution, laws, and treaties of the United States, and therefore the jurisdiction of this Court is based on Article III, § 2 of the United States Constitution, 28 U.S.C. §§ 1331, 1353, 1361, and 5 U.S.C. § 704.

### IV. GENERAL ALLEGATIONS

10. The Tuscarora Indians are a confederation of Iroquois Indians who have lived in what is now North Carolina since before the arrival of Sir Walter Raleigh in the 16th Century. The confederation consists of the Skaruren (Hemp Gatherers), the Akwaensaka (Shirt Wearers), and the Kautanaka (People of the Sunken Pine). The Tuscarora lived amid other Indian tribes, including the Cherokee and Catawba. Plaintiff Skaroreh Katenuaka Nation includes the Skaruren and the Kautanaka.

11. In 1709, the Tuscarora Indians ruled coastal and piedmont North Carolina. In the Tuscarora War, the North and South Carolina colonists began driving the Tuscarora Indians from their homeland by 1713. Some of the Tuscaroras went North while others took refuge in the swamps of Southern North Carolina.

12. The Tuscaroras who fled North Carolina have been recognized by the Bureau of Indian Affairs as the Tuscarora Nation of New York. 67 Fed. Reg. 46328 (July 12, 2002).

13. The Tuscarora Indians who remained in North Carolina and their descendants retain their tribal sovereignty in Plaintiff Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

14. Pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. 461 *et. seq.*, the Tuscarora Indians in North Carolina are Indians entitled to tribal recognition through Plaintiff Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina. However, Defendant Secretary of the Interior has arbitrarily, capriciously, and in an abuse of her discretion, failed and refused to recognize their tribal status.

15. Beginning in 1885, the United States and North Carolina governments have adopted legislation or other documents assigning different names to the Tuscarora Indians in North Carolina. Those names, which have no historical authenticity, have included "Croatan Indians," "Indians of Robeson County," "Sioux Indians," "Siouan Indians of the Lumber River," and "Lumbee Indians." Although the Tuscarora Indians have no control over what other governments call them, their sovereignty extends to the name they give themselves and their preservation of their identity pursuant to their historic name, as well as their historic customs, traditions and laws.

16. On April 8, 1935, Assistant Solicitor Felix S. Cohen of Defendant United States Department of the Interior, by Memorandum for the Commissioner of Indian Affairs, advised that the Tuscarora Indians (he called them "Siouan Indians) in North Carolina could organize for federally recognized tribal rights and the establishment of a reservation either through the outright purchase of land by the Secretary of the Interior or by the relinquishment of land purchased by the Indians themselves to the United States to be held in trust for the tribe, or by a

4

combination of those two methods. In 1936, Commissioner of Indian Affairs John Collier advised that the first step would be to establish the number of Indians of one-half or more blood and the second step would be for the Department to take a parcel of land into trust for the tribe.

17. In about 1934, 209 Tuscarora Indians in North Carolina petitioned the Bureau of Indian Affairs for recognition.

18. In 1938, the United States Department of the Interior Office of Indian Affairs, testing those 209 North Carolina Tuscarora petitioners, identified at least 22 as entitled to federal recognition as Indians of one-half or more degree and enrolled them pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461 *et. seq.* One of the 22 was Mr. Lawrence Maynor. The certification noted that Maynor had "(2 brothers, 5 sisters, 2 sons, 2 daughters)". Plaintiffs Martha Maynor and Lester Locklear are sisters of Lawrence Maynor. Plaintiff Alford Maynor is one of the sons of Lawrence Maynor. Plaintiff Vondola Locklear is one of the daughters of Lawrence Maynor. Plaintiff Roy Maynor is one of the sons of Mr. Lawrence Maynor. Four of the full sisters of Mr. Lawrence Maynor, including Plaintiff Martha Maynor, are matriarchs of the Plaintiff Nation. On April 8, 1936, Assistant Solicitor Felix S. Cohen of Defendant United States Department of the Interior, by Memorandum, determined that an estimate that "at least several hundred {are} entitled to recognition as of one half or more Indian blood is probably quite conservative."

19. Thereafter, the United States Department of the Interior, in addition to providing housing assistance benefits to those Indians under the Indian Reorganization Act of 1934, began taking land into trust for the purpose of accomplishing their tribal recognition as provided by § 16 of the Indian Reorganization Act of 1934.

20. Originally through the Bureau of Indian Affairs but later, apparently due to a lack of BIA funds, through the Department of Agriculture, between approximately 1935 and 1939 the United States acquired approximately 9,333.42 acres of land (the "Pembroke Farms") in Robeson County by purchase and by condemnation through the United States District Court for the Eastern District of North Carolina in an Indian Resettlement Project for the purpose of establishing a reservation for the Tuscarora Indians, pursuant to the Memorandum of Assistant Solicitor Cohen and the advice of Commissioner John Collier. The United States Department of the Interior, though experiencing some confusion, understood the public purpose for the purchase and condemnation of the Pembroke Farms tracts to be the establishment of a reservation for the Tuscarora Indians. At least part of the land was set aside for tribal members under the name of the Red Banks Mutual Association and several Tuscarora families were settled on the Red Banks land.

21. However, between approximately 1939 and 1973, the Farm Security Administration of the United States Department of Agriculture, which administered the Pembroke Farms Project though it was an Resettlement Project for Indians, conveyed fee title to the Pembroke Farms tracts out of Federal ownership, over the objection of the Tuscarora community and the Office of Indian Affairs of the United States Department of the Interior. The sale of that land may have been illegal because it was done without the consent of the tribe and without statutory authorization, *see*, Indian Nonintercourse Act of 1790 and 1793, 25 U.S.C. § 177, but the arrangements surrounding the land were confused.

22. On several occasions, Tuscarora Indians, including members of Plaintiff Skaroreh Katenuaka Nation, have applied to the Bureau of Indian Affairs of the United States Department of the Interior for tribal recognition.

23. In 1971, several of the 22 identified as Indian by the Office of Indian Affairs, including Tuscarora Indian Lawrence Maynor, petitioned the Secretary of the Interior to establish a reservation/territory for them as certified Indians.

24. On November 29, 1971, the Secretary of the Interior, by R.M. Pennington, Acting Chief, Division of Tribal Operations, Bureau of Indian Affairs, wrote to Mr. Carnell Locklear, a member of Plaintiff Skaroreh Katenuaka Nation, with a list of the 22 identified by the Office of Indian Affairs and advising Skaroreh Katenuaka Nation: "It should be noted that all of the full brothers and sisters of these twenty-two persons would also be considered on-half or more Indian. Further, all of the children of persons considered one-half or more Indian are automatically considered at least one-quarter Indian.

25. In 1973, Tuscarora Indian Lawrence Maynor (the full brother of Plaintiffs Martha Maynor and Lester Locklear and the father of Plaintiffs Alford Maynor, Vondola Locklear, and Roy Maynor), one of the 209 Tuscarora Indians who had applied for federal recognition, one of the 22 identified as Indian by the Office of Indian Affairs, and one of those who had petitioned the Secretary of the Interior to establish a reservation/territory for them as certified Indians, filed an action in this Court seeking a declaratory judgment establishing eligibility for benefits under the Indian Reorganization Act of 1934. *Maynor v. Morton,* United States District Court for the District of Columbia, Civil Action No. 337-73. One of the benefits the action sought was tribal

recognition and the establishment of a reservation/territory pursuant to § 16 of the Indian Reorganization Act of 1934..

26. On April 4, 1975, the United States Court of Appeals, in *Maynor v. Morton*, 510 F.2d 1254, 1255, 1259 (D.C. Cir. 1975), directed the District Court "to enter the declaratory judgment sought by plaintiff-appellant Maynor." The Court noted: "Among these benefits {under the Indian Reorganization Act of 1934} was the right to petition the Secretary to establish a reservation for such individuals, which, if granted, would afford them access to a wide range of federal Indian services (as members of a recognized Indian group on a reservation)." Citing the recent decision of the United States Supreme Court in *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474 (1974), the Court "stated that 'the overriding purpose of that particular {Indian Reorganization} Act was to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically.'" The Court expressly found that the fact that Maynor and his tribe did not have a reservation/territory at that time did not mean that Maynor was not entitled to the benefits provided by the Indian Reorganization Act of 1934, and particularly "noted that as little as one-quarter Indian blood suffices to confer many IRA benefits to persons living on a reservation." 510 F.2d at 1256.

27. On April 10, 1975, this Court issued an Order granting a declaratory judgment on behalf of Mr. Lawrence Maynor "establishing his eligibility for benefits under the Indian Reorganization Act of 1934".

28. Since the decision in *Maynor v. Morton* on April 4, 1975, the Tuscarora Nation has on several occasions applied to the Secretary for federal recognition, and has also offered to donate land to the United States to be held in trust for the tribe to create a reservation/territory or

requested that the United States recover or purchase land to be held in trust for the tribe to create a reservation/territory. On August 27-29, 1975, a Bureau of Indian Affairs task force, led by the Eastern Area Director, met with members of Plaintiff Skarroeh Katenuaka Nation, including Plaintiff Roy Maynor and his father, Lawrence Maynor, and other Tuscarora Indians of North Carolina. The task force report on the meeting reported that the Tuscarora Indians sought certain benefits under the Indian Reorganization Act in light of the decision in *Maynor v. Morton*. The task force report made clear that the Tuscarora Indians were seeking "Federal Recognition as a tribe (Tribal Identity)" and a "Home Base - Reservation".

> Among the benefits was the right to petition the Secretary to establish a reservation for such individuals, which if granted, would affort them access to a wide range of federal Indian services (as members of a reservation based federally recognized Indian group.)

> (This and other benefits under the IRA to non-tribal Indians were first detailed in a memorandum dated 8 April 1935 to the Commissioner of Indian Affairs from then Assistant Solicitor Felix S. Cohen who later authored the treatise FEDERAL INDIAN LAW (1942).

According to the task force report, the task force report explained the benefits as follows:

> May organize under Section 16 and 17 of the Wheeler-Howard Act, if the <u>Secretary of the Interior sees fit</u> to establish for these eligible Indians a reservation. Such a reservation might be established either by outright purchases of land by the Secretary of the Interior under Section 5 of the Wheeler-Howard Act or by relinquishment to the United States of land purchased by or donated to the Indians themselves.

The task force advised the Tuscarora Indians that it "would recommend that the land be taken into trust."

On July 24, 1987, Mr. Lawrence Maynor wrote to the Bureau of Indian Affairs on the letterhead of the Tuscarora Tribe of N.C., Inc., pursuant to "Morton vs. Maynor as a result of the Indian Reorganization Act of 1934," applying for "specific services through the B.I.A. for myself and all of my descendants, whom are enrolled and certified members of the Tuscarora Indians of


North Carolina. The enclosed listing are those persons who are eligible under my parsonage as more than half-blood Indians of one tribe." On August 30, 1989, the Assistant Solicitor of the Department of Indian Affairs of the United States Department of the Interior wrote to Plaintiff Roy Maynor of the "Tuscarora Indian Nation of North Carolina" as follows:

> Following the *Maynor* decision, representatives of the Bureau of Indian Affairs met with the plaintiff and other survivors of the 21 who had been certified and described the benefits for which they might be eligible. Later they received those benefits, primarily housing. We believe the *Maynor* decision has been fully implemented.
> The "Tuscarora Nation of North Carolina" (*sic*) was not a party to the *Maynor* case. Since it was not a party to the case, the court's decision did not mandate the BIA to take any action with regard to the "Tuscarora Nation."
> The decision in *Maynor v. Morton* does not affect any group of Indians seeking recognition, including those to whom you refer as the "Tuscarora Nation of North Carolina" (*sic*).

29. Since 1956, and even since the decision in *Maynor v. Morton*, the Secretary has taken the position that the last sentence of the so-called "Lumbee Act" of June 7, 1956 terminated the right of the Tuscarora Indians in North Carolina under the Indian Reorganization Act of 1934 and made them ineligible under that Act to petition for tribal recognition. However, in *Maynor v. Morton*, the Court expressly held: "On the plain language of the statute, we think the Secretary and his Deputy Solicitor erred. . . . Congress was very careful not to confer *by this legislation* any special benefits on these people so designated as Lumbee Indians. But we do not see that Congress manifested any intention whatsoever to take away any rights conferred on any individuals by any *previous* legislation." 510 F.2d at 1257-1258. The persistence to the present day of the Secretary's *pre-Maynor v. Morton* "recognition and termination" position in defiance of the *Maynor v. Morton* decision apparently rests on an October 23, 1989 Memorandum from Associate Solicitor for Indian Affairs William G. Lovell to the Deputy to the Assistant Secretary-- Indian Affairs (Tribal Services), which 1989

Memorandum takes the same position as the November 28, 1972 Memorandum from the Associate Solicitor for Indian Affairs to the Commissioner of Indian Affairs, which *Maynor v. Morton* expressly declared to be in error, *see* 510 F.2d at 1257 -- despite the intervening contrary decision in *Maynor v. Morton*. *See*, Memorandum of Points and Authorities in Support of Defendant United States' Motion to Dismiss, at page 18, footnote 7, filed in *Maynor v. Norton*, United States District Court for the District of Columbia, Civil Action No. 1:03CV01559:

> Based on the analysis of this disclaimer language {in the last sentence of section one of the Lumbee Act}, Interior has determined that this Act constitutes termination legislation within the meaning of the acknowledgment regulations' section 25 C.F.R. § 83.3(e) and § 83.7(g), which jointly operate to preclude the Bureau of Indian Affairs from considering the application of groups considered to be 'Lumbee Indians' for acknowledgment.

30. In *Maynor v. Morton*, the Court noted that the Department of the Interior was responsible for having that sentence added to the 1956 act, 510 F.2d at 1257 and expressly held the sentence did not take away any rights that were granted under previous Congressional legislation, specifically the Indian Reorganization Act of 1934. 510 F.2d at 1258. Thus, the Court held that "On the plain language of the statute, we think the Secretary and his Deputy Solicitor erred" by interpreting the 1956 Act to take away rights that had been conferred by the Indian Reorganization Act of 1934. 510 F.2d at 1257. Nevertheless, the Secretary has persisted in maintaining that erroneous position in defiance of the Court and on that basis has refused to entertain, consider or process any recognition petition from Plaintiffs. That position is clearly arbitrary, capricious, and an abuse of the Secretary's discretion, in defiance of this Court. That arbitrary and capricious action is in violation of the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461, *et. seq.*, the Nonintercourse Act, 25 U.S.C. § 177, and the Fifth ("(N)or shall any person . . . be deprived of life, liberty, or property without due process of law;"), Ninth ("The

11

enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people;"), Tenth ("The powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people), and Thirteenth ("Neither . . . involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction;) Amendments to the United States Constitution.

31. *Maynor v. Morton* acknowledged that "Maynor is one of some 40,000 Indians who live in and around Robeson County in North Carolina." 510 F.2d at 1256. Those Indians have suffered severe discrimination against them as Indians, but the Bureau of Indian Affairs has never recognized a tribe among them. Demanding documentation that the Tuscarora Tribe did not choose or need to maintain, relying on the effects of abuses that the Tuscarora Tribe has suffered from the United States and North Carolina governments, including the assigning to them of names without any historical or other basis in authenticity and thereby trying to steal their identity, and taking advantage of the passage of time that has resulted from their delays in granting the recognition to which the Tuscarora Tribe have been entitled, and by defying the decision in *Maynor v. Morton*, the Defendants, without denying that the Tuscaroras in North Carolina are Indians because there is no denying it, have refused to acknowledge their tribal status and the sovereignty that they have never given up.

32. Defendant Secretary of the Interior has arbitrarily, capriciously and in an abuse of her discretion, refused to provide tribal recognition.

33. Because of the persistence of the position of Defendant Secretary of the Interior in violation of the decision of the United States Court of Appeals for the District of Columbia

Circuit and the Order of this Court in *Maynor v. Morton*, it would be futile for Plaintiffs to file any further applications for recognition with Defendant Secretary of the Interior.

## V. FIRST CLAIM -- DECLARATORY JUDGMENT

34. Plaintiffs reallege the allegations in Paragraphs 1-32.

35. Defendant Secretary of the Interior has acted arbitrarily, capriciously and in an abuse of discretion by refusing to accord the Tuscarora Nation the benefits to which it is entitled pursuant to the Indian Reorganization Act of 1934, including tribal recognition.

36. Plaintiffs have exhausted their administrative remedies. To the extent that the Court might determine that Plaintiffs have not exhausted their administrative remedies, any such exhaustion or further exhaustion would be futile in view of the Secretary's determined position in defiance of the Court's Order in *Maynor v. Morton*.

37. Plaintiffs are entitled to a declaratory judgment:

(A) That Plaintiffs are eligible for federal recognition and that the 1956 so-called Lumbee Act did not terminate that eligibility.

(B) That federal recognition is extended to the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

(C) That the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina and its members are eligible for all federal benefits and services furnished to federally recognized Indian tribes and their members because of their status as Indians.

## VI. SECOND CLAIM -- MANDAMUS

38. Plaintiffs reallege the allegations in Paragraphs 1-36.

13

39. Plaintiffs are entitled to a writ of mandamus compelling Defendant Secretary of the Interior:

(A) To recognize the tribal status of the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

(B) To confer on the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina, benefits to which they are entitled pursuant to the Indian Reorganization Act of 1934, including § 16 of the Indian Reorganization Act of 1934.

(C) To establish a reservation/territory for the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina, using land donated to the United States to be held in trust for that purpose and by recovering Pembroke Farms and Red Banks or by purchasing or condemning land to be held in trust for that purpose.

(D) To provide funds for rebuilding the Tuscarora Nation, including funds for the present litigation, pursuant to the Indian Reorganization Act of 1934.

## VII. THIRD CLAIM -- CONTEMPT

40. Plaintiffs reallege the allegations in Paragraphs 1-38.

41. Plaintiffs request that the Court issue an Order to Defendant Secretary of the United States Department of the Interior, to show cause why he or she should not be held in contempt for violation of the April 10, 1975 Order of this Court in *Maynor v. Morton*, United States District Court for the District of Columbia, Civil Action No. 337-73, pursuant to *Maynor v. Morton*, 510 F.2d 1254, 1255, 1259 (D.C. Cir. 1975).

## VIII. FOURTH CLAIM -- DAMAGES.

42. Plaintiffs reallege the allegations in Paragraphs 1-40.

43. Plaintiffs have suffered damages in an amount in excess of $75,000 as a result of the denial of their rights and benefits by Defendant Secretary of the Interior.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court award Plaintiffs:

1. A declaratory judgment that Plaintiffs are eligible for federal recognition and that the 1956 so-called Lumbee Act did not terminate that eligibility.

2. A declaratory judgment extending federal recognition to the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

3. A declaratory judgment that the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina, and its members, are eligible for all federal benefits and services pursuant to the Indian Reorganization Act of 1934.

4. A writ of mandamus ordering Defendant Secretary of the Interior to recognize the tribal status of the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina.

5. A writ of mandamus ordering Defendant Secretary of the Interior to confer on the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina, all benefits to which they are entitled pursuant to the Indian Reorganization Act of 1934, including § 16 of the Indian Reorganization Act of 1934.

6. A writ of mandamus ordering Defendant Secretary of the Interior to establish a reservation/territory for the Skaroreh Katenuaka Nation, a/k/a Tuscarora Nation of Indians of North Carolina, using land donated to the United States to be held in trust for that purpose and

by recovering Pembroke Farms and Red Banks, including land now held by Defendant State of North Carolina, or by purchasing or condemning land to be held in trust for that purpose.

7. A writ of mandamus ordering Defendant Secretary of the Interior to provide funds for rebuilding the Tuscarora Nation, including funds for the present litigation.

8. An order to Defendant Secretary of the Interior requiring Defendant Secretary of the Interior to show cause why he should not be held in contempt for violation of the April 10, 1975 Order of this Court in *Maynor v. Morton*, United States District Court for the District of Columbia, Civil Action No. 337-73, pursuant to *Maynor v. Morton*, 510 F.2d 1254, 1255, 1259 (D.C. Cir. 1975).

9. Damages in an amount in excess of $75,000 for the denial of rights, denial of benefits, taking of land, taking of property, and contempt and violation of the April 10, 1975 Order of this Court in *Maynor v. Morton*, United States District Court for the District of Columbia, Civil Action No. 337-73, pursuant to *Maynor v. Morton*, 510 F.2d 1254, 1255, 1259 (D.C. Cir. 1975).

10. A reasonable attorney's fee.

11. Costs.

12. Such other and further relief as to the Court seems just and proper.

Respectfully submitted,

Martha Maynor
53 Charlotte Road
Red Springs, N. C. 28372

*Lester Locklear*
Lester Locklear
6557 Rennert Road
Shannon, N. C. 28386

*Alford Maynor*
Alford Maynor
100 Lockwood Drive
Pembroke, N. C. 28372

*Vondola Locklear*
Vondola Locklear
100 Lockwood Drive
Pembroke, N. C. 28372

*Roy Maynor*
Roy Maynor
100 Lockwood Drive
Pembroke, N. C. 28372

17